JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Jayant W. Tambe
Lisa G. Laukitis
Benjamin Rosenblum
Bart Green

Attorneys for Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
:
In re:                                                       : Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.,*                     : Case No. 08-13555 (JMP)
:
Debtors.                                                     : (Jointly Administered)
:
---------------------------------------------------------------X
:
LEHMAN BROTHERS SPECIAL FINANCING                            :
INC.,                                                        :
            Plaintiff,                                       :
                                                             : Adv. Proc. No. 13-_____ (JMP)
v.                                                           :
:
FEDERAL HOME LOAN BANK OF                                    :
CINCINNATI,                                                  :
:
            Defendant.                                       :
---------------------------------------------------------------X

**ADVERSARY COMPLAINT**

Lehman Brothers Special Financing Inc. ("LBSF"), through Lehman Brothers Holdings Inc. ("LBHI"), the Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), as and for this Complaint against defendant Federal Home Loan Bank of Cincinnati ("FHLB") alleges as follows:

## INTRODUCTION

1.      This action seeks recovery from FHLB of millions of dollars it owes LBSF under a contract between the parties concerning eighty-seven interest rate swap and option transactions (the "<u>Transactions</u>").

2.      The key facts surrounding this action are undisputed:  At 1:45 a.m. on September 15, 2008, LBHI filed for bankruptcy protection pursuant to chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  LBHI's bankruptcy filing constituted an "Event of Default" under the contract between LBSF and FHLB.  This Event of Default triggered an "Automatic Early Termination" of the Transactions.

3.      There is also no dispute that upon the termination of the Transactions, FHLB was obligated to make a termination payment to LBSF (the "<u>Early Termination Payment</u>").

4.      FHLB, however, breached the contract by failing to comply with the agreed-upon methodology for determining the Early Termination Payment.  On September 25, 2008, FHLB wired a partial remittance to LBSF in purported satisfaction of its obligations under the contract.  The partial remittance represented FHLB's erroneous calculation of the Early Termination Payment minus certain setoffs provided for in the contract.  As a result of the improper partial remittance, FHLB has paid to LBSF only a fraction of the Early Termination Payment to which LBSF is contractually entitled.

5.      In the contract governing the Transactions, the parties agreed that the Early Termination Payment was required to be based upon the market value of the Transactions "on or as soon as reasonably practicable after the [] Early Termination Date."  The parties further agreed that an Early Termination Date would occur "as of the time immediately preceding the institution of the relevant [bankruptcy] proceeding."  Pursuant to the plain language of the

contract and applicable law, the Early Termination Date for the Transactions is the date that LBHI instituted bankruptcy proceedings, September 15, 2008.

6. FHLB has ignored the contract and taken the position that the Early Termination Date was September 12, 2008, several days before LBHI filed for bankruptcy. Based primarily on this contention, FHLB has refused to pay LBSF the amounts due under the agreement. As a result, it has withheld from LBSF and its creditors tens of millions of dollars.

7. LBSF brings this action seeking:

(i) a declaratory judgment that the Early Termination Date was September 15, 2008;

(ii) a declaratory judgment that FHLB's calculation of the Early Termination Payment as of September 12, 2008 must be disregarded;

(iii) a declaratory judgment that the Early Termination Payment should be calculated as of the Early Termination Date of September 15, 2008; and

(iv) an award requiring FHLB to pay to LBSF an Early Termination Payment in an amount to be determined at trial, plus applicable interest.

## JURISDICTION AND VENUE

8. This is an adversary proceeding brought pursuant to Section 541 of the Bankruptcy Code, Sections 2201 and 2202 of title 28 of the United States Code, and Rule 7001 of the Federal Rules of Bankruptcy Procedure to recover amounts due to LBSF by FHLB.

9. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Court has retained jurisdiction over this matter pursuant to Section 14.1 of the Plan and paragraphs RR and 77 of the order confirming the Plan.

10. This is a non-core proceeding pursuant to 28 U.S.C. § 157(b). LBSF consents to the entry of final orders and judgment by the Bankruptcy Court.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

12. This Court has personal jurisdiction over FHLB.

## PARTIES

13. On September 15, 2008, LBHI commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. As was made inevitable by LBHI's bankruptcy filing, LBSF sought bankruptcy protection shortly thereafter. LBSF's chapter 11 case has been consolidated with the other above-captioned debtors and debtors-in-possession, and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

14. LBSF is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1271 Sixth Avenue, New York, New York 10020.

15. FHLB is a federally-chartered, for-profit corporation that was established by the Federal Home Loan Bank Act of 1932, and is one of 12 District Federal Home Loan Banks. FHLB's central office is located at 221 East Fourth Street, 1000 Atrium Two, Cincinnati, Ohio 45202.

## BACKGROUND

### A. Relevant Contractual Provisions

16. LBSF and FHLB entered into eighty-seven interest rate swap and option transactions between 2001 and 2008 pursuant to a standard form 1992 Multicurrency-Cross Border ISDA Master Agreement, (the "Master Agreement"), a Schedule to the Master

- 4 -

Agreement (the "Schedule"), and a Credit Support Annex to the Schedule (the "CSA") (collectively, the "Agreement"), each dated as of September 6, 2001.

17. The Schedule named LBSF's parent corporation, LBHI, as a "Credit Support Provider" in connection with the Master Agreement. *See* Schedule § 4(g). LBHI also acted as a guarantor for LBSF's obligations under the Master Agreement. Schedule § 4(f).

18. The Master Agreement identifies a series of events or circumstances, the occurrence of which constitutes an "Event of Default" entitling the Non-defaulting Party to terminate all outstanding Transactions. Master Agreement § 5(a). Section 5(a)(vii) of the Master Agreement provides that the bankruptcy of either party or any credit support provider of a party is one such Event of Default.

19. In the Schedule to the Master Agreement, the parties made two selections as to the contractual terms relevant to the dispute at hand: 1) Automatic Early Termination, and 2) Second Method and Market Quotation.

(1) Automatic Early Termination

20. LBSF and FHLB agreed that "Automatic Early Termination" as defined in section 6(a) of the Master Agreement would apply to the Transactions upon an Event of Default. Schedule § 1(e).

21. The Master Agreement provides that if the parties have elected to apply "Automatic Early Termination," then in most circumstances, "an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence" of certain bankruptcy and insolvency events. Master Agreement § 6(a). In other circumstances, as here, an Early Termination Date may occur "as of the *time immediately preceding* the institution of the relevant proceeding . . . ." *Id*. (emphasis added). The "relevant proceeding" occurs when "any

- 5 -

Credit Support Provider . . . institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy . . . ." *Id*. § 5(a)(vii)(4).

(2)    Second Method and Market Quotation

22.    In the Schedule, the parties elected the "Second Method and Market Quotation" to apply to determine a payment method in the event that an Early Termination Date was designated. Schedule § 1(f). The Second Method provides that upon the designation of an Early Termination Date resulting from an Event of Default

> an amount will be payable equal to (A) the sum of [i] the *Settlement Amount* (determined by the Non-defaulting Party) in respect of the Terminated Transactions and [ii] the Termination Currency Equivalent of the *Unpaid Amounts* owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

Master Agreement § 6(e)(i)(3) (emphasis added). In other words:

*Early Termination Payment = Settlement Amount + Unpaid Amount owing to the Non-defaulting Party – Unpaid Amounts owing to the Defaulting Party*

*Id*.

23.    Thus, under Second Method, the Non-defaulting Party is obligated to pay the Early Termination Amount *to* the Defaulting Party in certain circumstances.

24.    "Unpaid Amounts" are defined as amounts owing to a party that "became payable . . . on or prior to [the] Early Termination Date and which remain unpaid as at [the] Early Termination Date." Master Agreement § 14 (Definition of "Unpaid Amounts"). The Early Termination Payment plainly includes all amounts that became payable to LBSF under the Transactions *on* the Early Termination Date.

- 6 -

25. "Settlement Amount" is defined in part as an amount equal to the sum of the "Market Quotations" procured by the Non-defaulting Party (FHLB) for each of the Transactions outstanding as of the Early Termination Date, in instances where a Market Quotation can be determined. *Id*. § 14 (Definition of "Settlement Amount").

26. A "Market Quotation" is defined as an amount that "Reference Market-Makers" – four leading dealers in the relevant market – would pay to enter into a replacement transaction "that would have the effect of preserving . . . the economic equivalent of any payment or delivery" for the parties of the Transactions "but for the occurrence of the [] Early Termination Date." *Id*. § 14 (Definition of "Market Quotation"). Under Market Quotation, "each Reference Market-maker [should] provide its quotation to the extent reasonably practicable . . . *on or as soon as reasonably practicable after the relevant Early Termination Date*." *Id*. (emphasis added).

27. The Master Agreement specifically contemplates the possibility that Market Quotations cannot be determined or that they may not, in certain circumstances, serve as a "reasonable pre-estimate of loss." *Id*. § 14 (Definition of "Settlement Amount"); § 6(e)(iv). In such circumstances, the Master Agreement provides that the Settlement Amount will be equal to the Non-defaulting Party's "Loss." *Id*. § 14 (Definition of "Settlement Amount").

28. Section 14 of the Master Agreement defines "Loss," in turn, to mean the

> amount that [the Non-defaulting Party] reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement . . . including any loss of bargain, cost of funding or, at the election of [the Non-defaulting] party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made . . . on or before the relevant Early Termination Date

and not made . . . . A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable.

### B. FHLB Has Withheld Millions from LBSF and Its Creditors

29. At 1:45 a.m. on September 15, 2008, LBSF's parent corporation, LBHI, filed a voluntary petition for Chapter 11 bankruptcy. Because LBHI was designated as LBSF's Credit Support Provider in the Schedule for the Transactions, LBHI's bankruptcy filing constituted an Event of Default under the Master Agreement and triggered the Automatic Early Termination. On the Early Termination Date, LBSF was "in the money" on the Transactions, and thus, LBHI's liability as guarantor of the Transactions was fixed at zero.

30. On September 15, 2008, FHLB sent a letter to LBSF in which FHLB stated:

> "[A]n Event of Default . . . has occurred and is continuing under section 5(a)(vii)(4) of the Master Agreement, in that on September 15, 2008 the Credit Support Provider instituted 'a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law . . . .' Accordingly, pursuant to section 6(a) of the Master Agreement, *Automatic Early Termination occurred as of the time immediately preceding the institution of that proceeding.*"

(emphasis added).

31. FHLB further wrote that it "*will attempt* to obtain quotations from Reference Marketmakers in order to determine Settlement Amounts for all Terminated Transactions. [FHLB] will provide you with its determination of the net amount payable under Section 6(e)(i)(3) of the Master Agreement as soon as is reasonably practicable." *Id*. (emphasis added).

32. At the close of business on September 15, 2008, the Early Termination Payment to which LBSF was entitled was $77,609,586.68, not including interest.

33. On September 16, 2006, FHLB entered into a replacement transaction with the same terms and conditions as the Transactions. According to FHLB's filings with the Securities and Exchange Commission:

> On Tuesday, September 16, [FHLB] replaced [the Transactions] with new swaps transacted with other counterparties. The new swaps had the *same terms and conditions as the terminated LBSF swaps*. The counterparties to the new swaps paid [FHLB] a net fee of $232 million to enter into these transactions based on the estimated market values at the time [FHLB] replaced the swaps. *The $43 million difference* between the market value fee [FHLB] paid Lehman and the market value fee [FHLB] received on the replacement swaps *represented an economic gain* to [FHLB] based on changes in the interest rate environment between the termination date and the replacement date.

FHLB Form 10-K for 2008 (emphasis added). Thus, FHLB's gain on the replacement transaction was reduced to $43 million after accounting for FHLB's partial payment of about $13.7 million to LBSF on September 25, 2008, which is discussed further below.

34. On September 25, 2008, FHLB sent a letter to LBSF, claiming that the Automatic Early Termination Date was Friday, September 12, 2008. The letter stated, "As a consequence of an Event of Default under Section 5(a)(vii)(4) of the Master Agreement, the Master Agreement (including all Transactions thereunder) was terminated automatically effective as of the time immediately preceding the bankruptcy filing of Lehman Brothers Holdings Inc., or as of the close of business on Friday, September 12, 2008."

35. In the September 25 letter, FHLB incorrectly asserted that the amount due to LBSF under the Agreement was $13,737,154.62. The letter also purported to provide LBSF with a statement showing FHLB's calculation of the Early Termination Payment in ostensible compliance with Section 6(d)(i) of the Master Agreement (the "<u>Calculation Statement</u>"). The Calculation Statement drastically understated the Early Termination Payment because FHLB used September 12, 2008, not September 15, 2008, as the Early Termination Date. FHLB

- 9 -

calculated the "Settlement Amount" payable to LBSF on the basis of Market Quotations reflecting the value of the Transactions as of the close of business on September 12, 2008, rather than Market Quotations reflecting the value of the Transactions "*on* or as soon as reasonably practicable *after* the relevant Early Termination Date" of September 15, 2008.  Master Agreement § 14 (Definition of "Market Quotation") (emphasis added).

36.  In the Calculation Statement, FHLB also asserted that the Early Termination Payment owed to LBSF amounted to only $191,921,859.83, and contended that no "Unpaid Amounts" were payable to LBSF.  The Early Termination Payment in the Calculation Statement, however, should have included a "Settlement Amount" of $257,243,079.96 payable to LBSF, not the $191,921,859.83 asserted in the Calculation Statement.  Because the Transactions were heavily "out of the money" to FHLB on September 15, 2008, the Transactions had a net market value of $257,243,079.96 in favor of LBSF, as determined on the basis of mid-market, mark-to-market prices prevailing as of the close of U.S. markets on September 15, 2008.

37.  On September 25, 2008, FHLB wired to LBSF the sum of $13,737,154.62 (the "Partial Remittance"), in purported satisfaction of its obligations in respect of the Early Termination Payment.  This sum represented the $191,921,859.83 erroneously calculated by FHLB to be the Early Termination Payment, less the sum of $178,194,668.86, representing certain uncontested setoffs on account of: (a) $178,061,762.00 in cash collateral previously posted by FHLB and already in LBSF's possession pursuant to the terms of the Credit Support Annex (hereinafter the "Posted Collateral"); (b) $112,906.86 in interest allegedly accrued and payable to FHLB thereon; and (c) $20,000 in legal fees allegedly incurred by FHLB "as a result of [LBSF's] default" and claimed to be payable to LBSF in accordance with Section 11 of the Master Agreement.

38. As discussed above, the Agreement required FHLB to pay to LBSF any gain that FHLB enjoyed as a result of the Early Termination. By making only a $13.7 million payment, FHLB breached the Agreement. On September 25, when it made the Partial Remittance, FHLB *knew* that its actual gain for the Early Termination, as disclosed in its financial statements, was at least $56.7 million—$43 million greater than the Partial Remittance. FHLB has wrongly withheld at least that amount from LBSF and its creditors since September 25, 2008.

39. The Partial Remittance also failed to include the Unpaid Amounts that were due to LBSF. Under the Agreement, a net sum of $513,218.27 was payable by FHLB to LBSF in respect of the Transactions on September 15, 2008. Those amounts, however, were not in fact paid by FHLB on or prior to September 15, 2008. Therefore, the Early Termination Payment was contractually required to include $513,218.27 in Unpaid Amounts payable to LBSF.

40. The following chart shows the components of (i) FHLB's incorrect Partial Remittance based on improper September 12, 2008 values, and (ii) the Early Termination Payment as of September 15, 2008 to which LBSF was entitled:

|  | **FHLB's Improper Partial Remittance**[1] | **Proper Early Termination Payment** |
|---|---|---|
| Settlement Amount | $191,921,859.83 | $255,291,037.27 |
| Unpaid Amounts | $0.00 | $513,218.27 |
| Posted Collateral | $(178,061,762.00) | $(178,061,762.00) |
| Interest on Posted Collateral | $(112,906.86) | $(112,906.86) |
| Legal Fees | $(20,000.00) | $(20,000.00) |
| **Total** | **$13,727,190.97** | **$77,609,586.68** |

Thus, not including interest, the portion of the Early Termination Payment that FHLB has failed to pay LBSF is $63,882,395.71, which equals $77,609,586.68 minus $13,727,190.97.

---

[1] These figures do not include FHLB's incorrect payment of $9,963.65 in interest due as of September 25, 2008. FHLB should have made an interest payment to FHLB of $201,204.50 on September 25, 2008.

### C.  Interest Due to LBSF

41.    The Master Agreement also requires FHLB to pay interest to LBSF on the portion of the Early Termination Payment that FHLB has not paid to LBSF, at the Applicable Rate specified in the Master Agreement, from and after the Early Termination Date up to the date on which the Early Termination Payment is paid in full.  Master Agreement §§ 6(d)(ii), 14; Schedule § 5(g).

### FIRST CAUSE OF ACTION
### (Declaratory Judgment that the Early Termination Date was September 15, 2008)

42.    LBSF repeats and incorporates the allegations contained in the preceding paragraphs as if set forth fully herein.

43.    As discussed above, FHLB has taken the untenable position that that the Early Termination Date was September 12, 2008.

44.    The Agreement provides that the Early Termination Date shall occur "as of the time immediately preceding the institution of the relevant [bankruptcy] proceeding or the presentation of the relevant [bankruptcy] petition."  Master Agreement § 6(a).

45.    LBHI filed for bankruptcy protection pursuant to the Bankruptcy Code at 1:45 a.m. on September 15, 2008.

46.    Consistent with the Master Agreement, the Early Termination Date occurred on September 15, 2008, the date on which LBHI commenced its voluntary bankruptcy proceeding under the Bankruptcy Code.

47.    There is an actual controversy between the parties regarding whether the Early Termination Date was September 15, 2008.  This controversy is now ripe for adjudication pursuant to 28 U.S.C. § 2201.

48.	This controversy has served as a major obstacle to the consensual resolution of the parties' dispute over the amount of the Early Termination Payment to which LBSF is entitled under the Agreement and applicable law. The resolution of this issue will clarify the legal obligations of the parties and afford relief from the uncertainty preventing consensual resolution of the dispute giving rise to this proceeding.

49.	Accordingly, LBSF requests that this Court enter a declaratory judgment that the Early Termination Date was September 15, 2008.

## SECOND CAUSE OF ACTION
**(Declaratory Judgment that FHLB's Calculation of the Early Termination Payment as of September 12, 2008 Must Be Disregarded)**

50.	LBSF repeats and incorporates the allegations contained in the preceding paragraphs as if set forth fully herein.

51.	FHLB's Early Termination Payment was, by FHLB's own admission, based on quotations purporting to represent the market value of the Transactions on September 12, 2008, a date three days prior to the Early Termination Date.

52.	The Master Agreement specifically provides that the Early Termination Payment shall be determined on the basis of Market Quotations reflecting the value of the Transactions "on or as soon as reasonably practicable after the Early Termination Date."

53.	Consistent with the express provisions of the Agreement and applicable law, the Early Termination Payment must be determined on the basis of the market values of the Transactions on September 15, 2008, or as soon thereafter as reasonably practicable.

54.	There is an actual controversy between the parties regarding whether FHLB may use the September 12, 2008 quotations to determine the Early Termination Payment. This controversy is now ripe for adjudication pursuant to 28 U.S.C. § 2201.

55. This controversy has served as a major obstacle to the consensual resolution of the parties' dispute over the amount of the Early Termination Payment to which LBSF is entitled under the Agreement and applicable law. The resolution of this issue will clarify the legal obligations of the parties and afford relief from the uncertainty preventing consensual resolution of the dispute giving rise to this proceeding.

56. Accordingly, LBSF requests that this Court enter a declaratory judgment that FHLB's calculation of the Early Termination Payment as of September 12, 2008 must be disregarded.

### THIRD CAUSE OF ACTION
**(Declaratory Judgment that the Early Termination Payment Must Be Calculated as of the Early Termination Date of September 15, 2008 or as Soon Thereafter as Reasonably Practicable)**

57. LBSF repeats and incorporates the allegations contained in the preceding paragraphs as if set forth fully herein.

58. The Master Agreement specifically provides that the Early Termination Payment shall be determined on the basis of Market Quotations reflecting the value of the Transactions "on or as soon as reasonably practicable after the Early Termination Date" or, if Market Quotations cannot be determined or would not produce a commercially reasonable result, on the basis of the Non-defaulting Party's Loss "as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable."

59. As discussed above, the Early Termination Date was September 15, 2008.

60. Moreover, FHLB has not alleged – and cannot possibly allege – that it was not "reasonably practicable" to obtain Market Quotations on September 15, 2008.

61. FHLB solicited and received quotations in respect of the Transactions from at least one Reference Market-maker, and actually entered into Replacement Transactions having

"the same terms and conditions as the . . . [Transactions]," on September 16, 2008. It was both "commercially reasonable" and "reasonably practicable" for FHLB to obtain Market Quotations in respect of the Transactions on September 15, 2008.

62. Accordingly, LBSF requests that this Court enter a declaratory judgment that the Agreement and applicable law require the Early Termination Payment to be calculated as of the Early Termination Date of September 15, 2008, or as soon thereafter as reasonably practicable.

## FOURTH CAUSE OF ACTION
(Breach of Contract)

63. LBSF repeats and incorporates the allegations contained in the preceding paragraphs as if set forth fully herein.

64. The Agreement constituted a valid contract between LBSF and FHLB.

65. LBSF has performed its duties under the Agreement.

66. FHLB breached the Agreement by failing to calculate the Early Termination Payment in accordance with the procedures set forth in the Agreement

67. FHLB breached the Agreement by failing to pay the Early Termination Payment in full to LBSF.

68. FHLB breached the Agreement by failing to pay LBSF the interest, calculated in accordance with the Agreement, on that portion of the Early Termination Payment that FHLB has not paid LBSF.

69. As a direct and proximate result of FHLB's breaches of the Agreement, LBSF has been deprived of a substantial sum of money in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, LBSF respectfully requests that judgment be entered as follows:

(1) Declaration that the Early Termination Date was September 15, 2008;

(2)  Declaration that FHLB's calculation of the Early Termination Payment as of September 12, 2008 breaches the Agreement and must be disregarded;

(3)  Declaration that the Agreement and applicable law require the Early Termination Payment to be calculated as of the Early Termination Date of September 15, 2008 or as soon thereafter as reasonably practicable;

(4)  Award of damages and applicable interest in an amount to be determined at trial; and

(5)  Such further relief as the Court deems just and proper.

Dated: April 17, 2013
      New York, New York

JONES DAY

*/s/ Jayant W. Tambe*

Jayant W. Tambe
Lisa G. Laukitis
Benjamin Rosenblum
Bart Green
222 East 41st Street
New York, New York  10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*Attorneys for Lehman Brothers Special Financing Inc.*

- 16 -